**UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
FORT WAYNE DIVISION**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CAUSE NO.: 1:17-CR-69-TLS-PRC |
| | ) | |
| IVAN JAIMES-MOLINA, | ) | |
| Defendant. | ) | |

**FINDINGS, REPORT, AND RECOMMENDATION OF
UNITED STATES MAGISTRATE JUDGE PURSUANT TO
28 U.S.C. § 636(b)(1)(B) & (C)**

This matter is before the Court on Defendant's Motion to Suppress Physical Evidence and Incorporated Memorandum in Support Thereof [DE 28], filed by Defendant Ivan Jaimes-Molina on April 5, 2018. Jaimes-Molina asks the Court to suppress all evidence seized by law enforcement agents obtained in violation of the Fourth Amendment on or about November 29, 2017, arguing that Sergeant Todd McCormick unreasonably extended the traffic stop to conduct a dog sniff.

On April 18, 2018, District Court Chief Judge Theresa L. Springmann entered an Order [DE 30] referring this matter to the undersigned Magistrate Judge for a report and recommendation on the instant motion pursuant to 28 U.S.C. § 636(b)(1)(B). This Report constitutes the undersigned Magistrate Judge's combined proposed findings and recommendations pursuant to 28 U.S.C. § 636(b)(1)(C). Finding that Sergeant McCormick did not unreasonably prolong the six-minute traffic stop, the Court recommends that the District Court deny the Motion to Suppress.

**PROCEDURAL BACKGROUND**

Defendant Ivan Jaimes-Molina is charged by way of a two-count Indictment, charging him with knowingly and intentionally possessing with the intent to distribute a controlled substance, including 50 grams or more of methamphetamine, in violation of 21 U.S.C. § 841(a)(1), and being

an alien illegally and unlawfully in the United States in possession of a firearm, in violation of 18 U.S.C. § 922(g)(5). *See* (ECF 13). The Indictment also includes a forfeiture allegation. *Id*.

## FACTUAL BACKGROUND

On November 29, 2017, at approximately 1:42 a.m., Sergeant Todd McCormick of the DeKalb County Sheriff's Department stopped a Chrysler 300 for traveling 78 m.p.h. in a 70 m.p.h. zone on southbound Interstate 69. (Tr. 7, 10). After entering the highway in his patrol car and catching up to the speeding Chrysler, Sergeant McCormick initiated a traffic stop by activating his emergency lights; the Chrysler driver complied with the emergency lights and pulled to the side of the highway. (Tr. 12-13). At the hearing, Sergeant McCormick described the annual certification of his radar unit and his daily verification of the unit's accuracy. (Tr. 10-12). With him in the patrol car that night was his K-9 partner, Niko. (Tr. 14). Sergeant McCormick has been training and working with Niko as a certified drug detection dog for more than four years, including monthly training, and Niko reliably detects the odors of marijuana, heroin, ecstasy, methamphetamine, crack cocaine, and base cocaine. (Tr. 6, 25-29).

After the Chrysler stopped, Sergeant McCormick notified dispatch of his location and the Chrysler's Florida license plate. (Tr. 13-14, 33). Sergeant McCormick approached the passenger side of the vehicle and spoke with the driver and sole occupant of the vehicle, later identified as Defendant Ivan Jaimes-Molina. (Tr. 14-15). At the hearing, Sergeant McCormick explained that his practice is to approach the passenger side of the vehicle to better see the driver and to stay out of harm's way from passing traffic; he also testified that limited visibility is a danger encountered with nighttime traffic stops. (Tr. 14-15).

2

Once he reached the passenger side of the car, Sergeant McCormick told Jaimes-Molina that he stopped him for going 78 m.p.h. in a 70 m.p.h. zone, and Jaimes-Molina provided his driver's license and registration when asked. (Tr. 15, 16). Jaimes-Molina initially contested the speeding, saying that he was going the speed limit. (Tr. 16). The vehicle's interior had papers and trash scattered about, and it appeared to Sergeant McCormick that Jaimes-Molina had packed in a hurry, with piles of clothes in the back seat. (Tr. 17). Sergeant McCormick described Jaimes-Molina as appearing nervous, as evidenced by shaking hands and cryptic responses. (Tr. 20).

Jaimes-Molina's driver's license was a temporary Florida license, and there was some initial confusion about Jaimes-Molina's name, as his last name appeared to be "Ivan" on the driver's license. (Tr. 16-18; Gov. Ex. 2). In Sergeant McCormick's experience, including his experience living in Florida, the red "temporary" notation on Jaimes-Molina's license indicated that he might be in the United States illegally. (Tr. 18); (Gov. Ex. 2). The vehicle registration was also from Florida, and the vehicle was owned by a male and female with a different address from Jaimes-Molina; Jaimes-Molina told Sergeant McCormick that the car belonged to a relative. (Tr. 16, 19; Gov. Ex. 3). Sergeant McCormick does not routinely ask for proof of insurance, but if information develops during the stop regarding insurance, he will then investigate this issue. (Tr. 17).

Leaving Jaimes-Molina in his vehicle, Sergeant McCormick went back to his patrol car, intending to issue a written warning for speeding. (Tr. 20). Sergeant McCormick's general practice is to write a warning for driving less than 10 m.p.h. over the limit; however, if other problems are discovered through the records checks, he addresses those circumstances (such as a stolen vehicle, an arrest warrant, additional charges, etc.) in addition to issuing the warning. (Tr. 22-24, 55).

During the time Sergeant McCormick was in his patrol car writing the warning, other officers were making radio requests related to separate investigations, including a domestic violence investigation that later caused the re-routing of Sergeant McCormick's initial backup. (Tr. 21, 43). Although he had called in the license plate and his location before initially exiting his patrol car, Sergeant McCormick had not yet gotten a response back from dispatch. (Tr. 21). Sergeant McCormick explained that the officers' vehicles are not equipped to do license plate or driver's license searches from the vehicles; the officers must radio in the request to dispatch. *Id.*; *see also* (Tr. 35). There is only one radio channel and one dispatcher for all the officers with the DeKalb County Sheriff's Department and the cities of Butler and Waterloo. (Tr. 21). In order to get the information from dispatch regarding the license plate that he had previously submitted, Sergeant McCormick has to make a radio call and, using a code, ask for a "read back." *Id*.

Sergeant McCormick testified that, with the radio initially occupied with other officers' requests, he filled out the paperwork for the warning and then exited his car with his certified K-9 partner and with Jaimes-Molina's documents and the written warning in hand. (Tr. 24). Once outside his car with the K-9, Sergeant McCormick read the driver's license number to dispatch over the radio and then deployed the K-9. (Tr. 24; Gov. Ex. 5).

Upon sniffing the license plate area of Jaimes-Molina's vehicle, the K-9's behavior immediately changed, demonstrating that he was "in odor," and the K-9 then aggressively sniffed along the driver's side of the car. (Tr. 24-25, 27, 31). This immediate behavior change was "every bit as much of an alert as the sit." (Tr. 54, 65). The K-9 alerted again to the presence of drug odor by sitting at the driver's door. (Tr. 24, 31-32). At that point, Jaimes-Molina rolled down his window and asked if everything was okay. (Tr. 24). In Sergeant McCormick's training and experience,

4

Jaimes-Molina's actions were unusual and indicative of concern about concealing illegal drugs. (Tr. 25).

By the time the K-9 alerted, Sergeant McCormick had not received the return of information from dispatch regarding the driver's license or the vehicle registration. (Tr. 32). Even if the K-9 had not alerted, Sergeant McCormick still had to resolve the issues with the driver's license and the vehicle ownership, give Jaimes-Molina the written warning for speeding, and return Jaimes-Molina's documents. (Tr. 32-33; Gov. Ex. 6).

Sergeant McCormick testified that he decided to deploy his K-9 because he was concerned about the word "temporary" on Jaimes-Molina's driver's license, the fact that Jaimes-Molina was traveling from Michigan to Florida late at night, the lack of luggage, and the men's clothing strewn about in a manner consistent with someone living out of a car and not staying anywhere for any length of time. (Tr. 29-30, 52-53). In Sergeant McCormick's experience, Michigan is a source state for drugs, so he concentrates on the south-bound vehicles. (Tr. 30). DeKalb County is approximately 20 to 25 miles from the Michigan border. *Id.* Sergeant McCormick testified that it seemed odd to him that Jaimes-Molina was traveling from Michigan to Florida in a vehicle that did not belong to him; he explained that one sign of a drug courier is driving a vehicle that belongs to someone else. (Tr. 46-47). Sergeant McCormick testified that a certain amount of nervousness is *not* fairly common in a traffic stop. (Tr. 51).

Sergeant McCormick has been a DeKalb County officer assigned to patrol duties for about eight years and has stopped well over 5,000 vehicles. (Tr. 4-5, 20). Prior to working for DeKalb County, Sergeant McCormick was a reserve officer in Allen County for about a year, and he was a flooring contractor for about 20 years. (Tr. 5). Sergeant McCormick graduated from the Indiana

Law Enforcement Academy, has ongoing training specializing in drug investigations and K-9 handling, and was promoted to the rank of sergeant about two years ago, supervising the six officers on his shift. (Tr. 4, 6-7, 30).

Sergeant McCormick's police car was equipped with an in-car camera system, with a camera recording the events to the front of the patrol car and with a second camera recording the events inside the patrol car. (Tr. 8-9; Gov. Ex. 1, 4). Once the lights or siren are activated, the in-car system captures video beginning about two minutes prior to the activation. (Tr. 12-13).

The front camera view video recording shows the following timeline of events, identified by the time-of-day counter on the video:

| | |
|---|---|
| 01:41:17 | The Chrysler passes Sergeant McCormick's position. |
| 01:41:20 | Sergeant McCormick departs the shoulder and enters the highway. |
| 01:42:05 | Sergeant McCormick engages his police lights. |
| 01:42:15 | The Chrysler begins to slow down, pulls over, and then stops on the highway shoulder at 01:42:31. |
| 01:43:08 | After exiting and walking behind his police car, Sergeant McCormick reaches the passenger side of the Chrysler. |
| 01:43:57 | Sergeant McCormick walks back to the police car with a license and registration in hand. |
| 01:44:12 | The sound of a door closing is heard. |
| 01:46:27 | Sergeant McCormick responds to a radio safety check. |
| 01:47:38 | Sergeant McCormick appears in front of his police car with the K-9 on a leash and then kneels next to the K-9. |
| 01:47:50 | While kneeling, Sergeant McCormick radios the driver's license information. |
| 01:48:12 | Sergeant McCormick initiates the dog sniff. |

6

| | |
|---|---|
| 01:48:13 | The K-9 sniffs the Chrysler's license plate. |
| 01:48:16 | The K-9 sniffs the rear quarter panel, rear driver's-side wheel area, and driver's door. |
| 01:48:23 | The K-9 sits at the driver's door, then gets up and continues to actively sniff. |
| 01:48:31 | The K-9 sits a second time at the driver's door. |

(Gov. Ex. 1); (Tr. 34).

The in-cabin view video recording shows the following timeline of events, identified by the video's time-elapsed counter in minutes and seconds rather than the time of day:

| | |
|---|---|
| 01:13 | Sergeant McCormick starts to depart from a parked position. |
| 01:59 | Sergeant McCormick engages the police lights. |
| 02:28 | The patrol car stops, and Sergeant McCormick provides his location and the license plate number to dispatch. |
| 02:47 | After looking at the Chrysler for several seconds, Sergeant McCormick exits the patrol car and emerges on the passenger side of his car, walking past his patrol car toward the Chrysler. |
| 04:05 | After walking back toward the passenger side of his patrol car and then around behind his car, Sergeant McCormick re-enters the patrol car. |
| 04:10 | Sergeant McCormick turns on the dome light and retrieves the warning book from his bag, with radio traffic audible. |
| 04:32 | With pen in hand, Sergeant McCormick examines the license and registration and begins writing the warning, periodically looking at the Chrysler. |
| 06:22 | Sergeant McCormick answers an apparent safety check on radio, then resumes writing. |
| 06:54 | Sergeant McCormick exits the patrol car with the written warning, the vehicle registration, and Jaimes-Molina's license. |
| 07:27 | After walking behind his patrol car, Sergeant McCormick walks toward the Chrysler with the K-9. |

7

| 07:34 | Sergeant McCormick kneels next to the K-9 in front of his patrol car and radios the drivers license information to dispatch. |
| 08:00 | Sergeant McCormick stands up and begins to walk the K-9 toward the Chrysler |
| 08:07 | The K-9 sniffs the Chrysler's license plate area. |
| 08:16 | The K-9 sits at the driver's door. |
| 08:25 | The K-9 sits again at the driver's door. |

(Gov. Ex. 4); (Tr. 34-37).

While writing the warning, Sergeant McCormick looked up at the Chrysler from time to time for safety reasons in order to see if Jaimes-Molina was moving, with the Chrysler's tinted windows making this more difficult. (Tr. 37). Sergeant McCormick walked behind his police car each time for safety reasons. *Id*. Prior to stopping Jaimes-Molina, Sergeant McCormick had experience with combative people during traffic stops. (Tr. 38, 61, 66). Rushing the process of a traffic stop compromises officer safety during the stop. (Tr. 66).

The audio recordings of the radio calls associated with this stop contain the following information identified by the time-of-day of the recording:

| 01:42:28 | transmission initiated by Sergeant McCormick to dispatch giving his location and the license plate number of the Chrysler prior to Sergeant McCormick exiting his vehicle (26 seconds) |
| 01:46:29 | status check initiated by dispatch and a response by Sergeant McCormick (13 seconds) |
| 01:47:53 | transmission initiated by Sergeant McCormick for a Florida driver's license check (20 seconds, ending at 01:48:13) |
| 01:48:46 | transmission initiated by Sergeant McCormick communicating positive dog alert (42 seconds) |

01:49:56          transmission by a different officer regarding a domestic dispute (00:00-
                  00:09/01:49:56-01:50:05); dispatch then offers Sergeant McCormick a "full
                  read back" (00:10-00:15/01:50:06-01:50:11); Sergeant McCormick requests
                  a driver status only (00:16-00:19/01:50:12-01:50:15); dispatch provides the
                  status of no warrants and valid license (00:20-00:27/01:50:16-01:50:23);
                  Sergeant McCormick acknowledges receiving the status (00:28-
                  00:31/01:50:24-01:50:27)

(Gov. Ex. 5); (Tr. 41-42, 43-44).

Sergeant McCormick testified that, when dispatch offered a "full read back," he asked for only the driver's license information because once the K-9 had alerted, he needed to focus on Jaimes-Molina, especially considering all the noise from the truck traffic, which made it difficult to hear. (Tr. 43-44).

Task Force Officer Peter Mooney of the U.S. Drug Enforcement Administration provided additional information about the safety issues officers face during traffic stops. (Tr. 71). Officer Mooney has been employed by the Fort Wayne Police Department (FWPD) for approximately fourteen years. (Tr. 70). Officer Mooney has been a member of the FWPD SWAT team for approximately ten years, and he has significant experience working cases and traffic stops with the FWPD Gang Unit and with the FWPD patrol division in the most dangerous part of town. (Tr. 71-74). Officer Mooney confirmed that it is necessary for safety to keep an eye on the car during a traffic stop. (Tr. 74-75). He also explained that an officer walks behind the police car so as not to be backlit by the headlights, which would make the officer a more visible target in the dark, and that it is safer to approach on the passenger side if there is traffic on the driver's side. (Tr. 74-75, 77). Officer Mooney testified that a stop merely for speeding presents a variety of unknown safety factors, including whether the driver is wanted for a murder or a robbery or will be combative. (Tr. 75-76). Officer Mooney explained that an officer must be prepared for anything because the action

9

of the suspect is always faster than the officer's reaction. (Tr. 76). Officer Mooney explained that rushing through a traffic stop can cause mistakes and can cause an officer to miss warning signs of potential danger. (Tr. 79-80).

## ANALYSIS

### I

Defendant Ivan Jaimes-Molina asks the Court to suppress all physical evidence seized as a result of the November 29, 2017 traffic stop. Jaimes-Molina contends that Sergeant McCormick did not act diligently but rather deliberately prolonged the traffic stop in order to conduct the dog sniff by stalling the ordinary task of checking Jaimes-Molina's driver's license.

The Fourth Amendment to the United States Constitution guarantees the right to be free from "unreasonable searches and seizures" by the government. U.S. Const. amend. IV. The Fourth Amendment protections extend "to brief investigatory stops of persons or vehicles that fall short of traditional arrest." *United States v. Arvizu*, 534 U.S. 266, 273 (2002). In *Rodriguez v. United States*, the United States Supreme Court reiterated that a routine traffic stop is more analogous to a "*Terry* stop" than a formal arrest. 135 S. Ct. 1609, 1614 (2015) (citing *Knowles v. Iowa*, 525 U.S. 113,1 17; *Arizona v. Johnson*, 555 U.S. 323, 330 (2009)).

The tolerable duration of a traffic stop is "determined by the seizure's 'mission,'—to address the traffic violation that warranted the stop and attend to related safety concerns." *Id*. (quoting *Illinois v. Caballas*, 543 U.S. 405, 407 (2005); citing *United States v. Sharpe*, 470 U.S. 675, 685; *Florida v. Royer*, 460 U.S. 491, 500 (1983)). Along with determining whether to issue a traffic ticket, the "mission" of a routine traffic stop typically involves "checking the driver's license,

determining whether there are outstanding warrants against the driver, and inspecting the automobile's registration and proof of insurance." *Rodriguez*, 135 S. Ct. at 1615.

As for conducting a dog sniff during a routine traffic stop, "the use of a well-trained narcotics-detention dog—one that 'does not expose noncontraband items that otherwise would remain hidden from public view'—during a lawful traffic stop, generally does not implicate legitimate privacy interests." *Caballes*, 543 U.S. at 409 (quoting *United States v. Place*, 462 U.S. 696, 707 (1983)). However, "a dog sniff is not fairly characterized as part of the officer's traffic mission" because it lacks the "same close connection to roadway safety" as the ordinary typical tasks and instead is a "measure aimed at 'detect[ing] evidence of ordinary criminal wrongdoing.'" *Rodriguez*, 135 S. Ct. at 1615 (quoting *Indianapolis v. Edmond*, 531 U.S. 32, 40-41 (2000); *Florida v. Jardines*, 569 U.S. 1, —, 133 S. Ct. 1409, 1416-17 (2013)). Therefore, a dog sniff "may not prolong or add time to the stop unless supported separately by individualized, reasonable suspicion." *United States v. Stewart*, 902 F.3d 664, 672 (7th Cir. 2018) (citing *Rodriguez*, 135 S. Ct. at 1616-17).

In *Rodriguez*, the Supreme Court resolved a circuit split on the question of whether police routinely may extend an otherwise completed traffic stop, absent reasonable suspicion, in order to conduct a dog sniff. 135 S. Ct. at 1614. The Court held that "a police stop exceeding the time needed to handle the matter for which the stop was made violates the Constitution's shield against unreasonable seizures." *Id*. at 1612. The Court further reaffirmed its holding in *Illinois v. Caballes* that "[a] seizure justified only by a police-observed traffic violation . . . 'become[s] unlawful if it is prolonged beyond the time reasonably required to complete th[e] mission' of issuing a ticket for the violation." *Id.* (quoting *Caballes*, 543 U.S. at 407). In other words, "[a]uthority for the seizure

11

ends when tasks tied to the traffic infraction are—or reasonably should have been—completed." *Rodriguez*, 135 S. Ct. at 1614 (citing *Sharpe*, 470 U.S. at 686).

The Court further specified that "[t]he critical question . . . is not whether the dog sniff occurs before or after the officer issues a ticket, . . . but whether conducting the sniff 'prolongs'—*i.e.*, adds time to—'the stop.'" *Rodriguez*, 135 S. Ct. at 1616. The fact that the officer completed the traffic-related tasks quickly and efficiently does not earn the officer "bonus time to pursue an unrelated criminal investigation" during the otherwise routine traffic stop. *Id.*

In the instant motion, Jaimes-Molina argues that Sergeant McCormick was not diligent in conducting the traffic stop because he did not radio to dispatch for the driver's license check from inside his police car while writing the warning ticket but instead waited to radio the request until he was outside the car getting ready to deploy his K-9 partner. Jaimes-Molina notes that Sergeant McCormick had all the information he needed to call in the driver's license information to dispatch once he left the passenger side of Jaimes-Molina's vehicle and returned to his patrol car. Jaimes-Molina further notes that it was Sergeant McCormick's intention from the beginning of the encounter to document his contact with Jaimes-Molina and to issue a written warning. Comparing the time it took Sergeant McCormick to write the warning (two and a half minutes) with the time it took dispatch to return the driver's license information once requested (one minute and fifty-seven seconds), Jaimes-Molina reasons that, if Sergeant McCormick had called in the driver's license information as soon as he got in his patrol car, he would have had the response from dispatch before he finished writing the warning. *See* (ECF 28, ¶¶ 5, 9).

Thus, Jaimes-Molina contends that Sergeant McCormick's intentional delay by not calling in the driver's license until he was outside of the vehicle and ready to conduct the dog sniff

unnecessarily and impermissibly prolonged the traffic stop in violation of the Fourth Amendment. Jaimes-Molina reasons that, by delaying an ordinary task until the officer is prepared to sweep with his K-9 or until a K-9 officer can respond, law enforcement officers would be able to conduct dog sniffs of every stopped vehicle without regard to any inquiry into reasonable suspicion, probable cause, or the presence of any evidence that suggests anything other than a traffic infraction has occurred. Jaimes-Molina asserts that law enforcement is then able to circumvent the protections of the Fourth Amendment for motorists stopped by an officer with a K-9 partner or in an area closely patrolled by a K-9 unit.

Jaimes-Molina omits several facts from his timing calculation that invalidate his reasoning. First, as a practical matter, Sergeant McCormick testified that he did not immediately radio the driver's license information to dispatch because there was already radio traffic as he was getting back in the patrol car. (Tr. 24). This is confirmed by the in-cabin video recording. *See* (Gov. Ex. 4). Sergeant McCormick testified that he would have had to wait for an opening in the radio communication to make his request. (Tr. 21). He explained that there is only one radio channel and one dispatcher for the officers that work for the DeKalb County Sheriff's Department as well as the cities of Butler and Waterloo. *Id*. Sergeant McCormick testified that it would have delayed the traffic stop if he had waited for an opening in the radio traffic to make his driver's license request. (Tr. 24).

Second, because of that radio traffic, Sergeant McCormick began writing the warning as soon as he re-entered his vehicle and then continued to complete that task diligently and without undue delay before moving to the next task. When asked at the hearing why he did not stop writing the warning in order to radio the driver's license information during a long break in the radio traffic, Sergeant McCormick testified that he did not need to proceed in that manner and that there was no

13

delay in the overall stop by completing one task at a time before proceeding to the next task. (Tr. 57). Jaimes-Molina has cited no law dictating the order in which an officer must conduct the various tasks that constitute the "mission" of the traffic stop and cites no case law requiring an officer to multi-task.

Jaimes-Molina contends that Sergeant McCormick's reasoning is belied by the minimal radio traffic during the time Sergeant McCormick was in his patrol vehicle, calculating that only 12% of the time was consumed with radio traffic with gaps of 93 seconds and 80 seconds. (ECF 37, p. 3). There is no inconsistency. Sergeant McCormick testified that, when he sat down in his patrol car, there was radio traffic; this is confirmed by the cabin video. Jaimes-Molina ignores Sergeant McCormick's explanation that, to make the radio call, he needed to wait beyond a silent period because other officers had requested information and needed to receive their response from dispatch. (Tr. 56-57). Sergeant McCormick further testified that he did not want to delay the stop, so he started writing the warning ticket, which is also confirmed by the cabin video. He testified, "There's nothing that states that I have to do two things simultaneously while I'm trying to preserve my safety on a traffic stop." (Tr. 57). He further testified that he "did not make any conscious decision to delay the stop." (Tr. 60).

Sergeant McCormick is an experienced officer, having made more than 5,000 traffic stops. A review of the in-cabin camera shows that he is not only patient and cautious while completing the written warning but also efficient and focused. There is no indication from the video that he is wasting time or off-task. There was nothing unreasonable about the order in which Sergeant McCormick proceeded with the normal mission of the traffic stop. In addition, both Sergeant McCormick and Officer Mooney testified that staying focused and not rushing is important for

safety and to avoid mistakes. Officer Mooney testified, "You do one thing at a time. You finish one thing and then to the next thing and so forth, and so forth until the traffic stop is completed." (Tr. 79). Sergeant McCormick did just that by focusing on writing the warning but yet stopping from time to time to look at the Chrysler for any activity by Jaimes-Molina; this was made more difficult by the tinted windows. "Because traffic stops are 'especially fraught with danger to police officers,' an officer may . . . take 'certain negligibly burdensome precautions in order to complete his mission safely.'" *Stewart*, 902 F.3d at 672 (quoting *Rodriguez*, 135 S. Ct. at 1616 (citing *Arizona*, 555 U.S. at 330)). Another such negligibly burdensome safety precaution taken by Sergeant McCormick was walking around behind his patrol vehicle to approach the passenger door of the Chrysler, rather than passing in front of his patrol vehicle or walking directly to the Chrysler's driver's door.

Jaimes-Molina also suggests that Sergeant McCormick's testimony is at odds with itself because, despite citing "officer safety" several times, Sergeant McCormick did not restrain Jaimes-Molina and did not call in the driver's license at the outset of the stop, which would have informed Sergeant McCormick of any details such as whether Jaimes-Molina is known to be armed or is a fugitive. Although Sergeant McCormick may have and probably would have benefited from an earlier driver's license check, he exercised reasonable judgment under all the circumstances, including the other radio traffic, to proceed through the traffic stop in the order that he deemed appropriate. "The question is not simply whether some other alternative was available, but whether the police acted unreasonably in failing to recognize it or to pursue it." *Sharpe*, 470 U.S. at 687. There are many ways in which the traffic stop could have unfolded. The manner that occurred during this traffic stop was not unreasonable.

15

Third, the order in which Sergeant McCormick proceeded with the traffic-stop related tasks did not unreasonably delay the overall traffic stop. In calculating that the one minute and fifty-seven seconds that the dispatcher took to gather the driver's license information could have occurred during the two and a half minutes that Sergeant McCormick was writing the warning, Jaimes-Molina fails to account for both the twenty seconds that it took Sergeant McCormick to call in the driver's license (when he was kneeling next to the K-9 in front of his police car) and the eighteen-second duration of the dispatcher's return call with the driver's license information. In other words, if Sergeant McCormick had paused while writing the warning to call in the driver's license information and then paused again to receive the call back information from dispatch, the total time inside the police car would have been extended by thirty-eight seconds. Thus, whether he was in his car writing the warning or outside the car initiating the dog sniff before walking toward the driver's door to deliver the written warning and return Jaimes-Molina's documents, Sergeant McCormick would have taken the same amount of time to get dispatch on the radio, to have dispatch respond, to relay the driver's license information to dispatch, and to finish the call and then to respond and listen to dispatch's call back with the requested information. It is irrelevant whether the radio communications occurred inside or outside of the police car.

In addition, Sergeant McCormick used his time efficiently outside the police car with the K-9. He initiated the call to dispatch while prepping his K-9, and while he was still on the radio with dispatch, Sergeant McCormick stood and initiated the dog sniff, with the K-9 alerting through a behavior change immediately at the license plate of the Chrysler. If the events had occurred as proposed by Jaimes-Molina, Sergeant McCormick likely would have still been inside his car

16

finishing the written warning or receiving driver's license information from dispatch by the time the dog alerted. Thus, the dog sniff did not unreasonably prolong the stop.

In *Rodriguez*, the dog sniff occurred after the completion of a twenty-two minute traffic stop, which included the officer explaining the written warning to the driver. 135 S .Ct. at 1612-13. The officer testified that, after explaining the warning and returning the driver's documents, the officer had "all the reason[s] for the stop out of the way" and had taken care of all the business related to the traffic stop. *Id*. at 1613. Only then, over the course of an additional eight minutes, did the driver refuse consent to a dog sniff, a backup officer arrived, and the officer ran his drug dog around the vehicle with the dog alerting. *Id*. at 1613.

In contrast, Sergeant McCormick had yet to radio for the driver's license check, to give Jaimes-Molina the warning ticket, and to return the driver's license and registration. *See Rodriguez*, 135 S. Ct. at 1612. The Supreme Court held that the critical issue is whether the dog sniff "prolongs" or "adds time to" the traffic stop and not whether the dog sniff occurs before or after the officer issues a ticket. *See Rodriguez*, 135 S. Ct. at 1616. The total time of the stop from when Jaimes-Molina starting pulling over his car (01:42:15) to when Sergeant McCormick initiated the dog sniff with his K-9 partner (01:48:12) was just under six minutes. One second later, still under six minutes, the K-9 alerted at the license plate by increased activity, and ten seconds after that, the K-9 alerted at the driver's door by sitting, just over six minutes after Jaimes-Molina began pulling off the highway.

Fourth, once the K-9 alerted at the license plate with a change in behavior, Sergeant McCormick had probable cause to believe that there was contraband in the vehicle. *United States v. Bentley*, 795 F.3d 630, 635 (7th Cir. 2015) ("An alert from an adequately trained and reliable drug

17

dog is sufficient to give rise to a finding of probable cause." (citing *United States v. Washburn*, 383 F.3d 638, 643 (7th Cir. 2004))).The K-9 alerted within one second of being deployed. Within the next ten seconds, the K-9 again alerted by sitting near the driver's door, and eight seconds later, the K-9 alerted again by sitting at the driver's door after having stood to continue sniffing.

Fifth, Jaimes-Molina's proposed timeline does not account for the completion of the traffic stop itself, which had not yet occurred at the time of the dog sniff and which would have included walking up to the Chrysler to talk to Jaimes-Molina about the warning and to return Jaimes-Molina's documents, following the same path that Sergeant McCormick walked with the K-9 during the sniff. Sergeant McCormick may also have had additional questions about the ownership of the vehicle, which could have taken additional, permissible time. *See Walton*, 827 F.3d at 688 (recognizing that, even after *Rodriguez*, an officer has a "grace period" to ask investigatory questions following the completion of a traffic stop, so long as the questions do not impose an "inconvenience" and finding that two additional minutes of discussion was not an inconvenience). Although the time it would have taken to deliver the written warning, to return the paperwork, and to ask any additional questions is unknown, these additional tasks would have taken the same amount of time or longer than the time it took Sergeant McCormick to take the K-9 out of the car and for the K-9 to alert within seconds at the Chrysler's license plate and then at the driver's door.

Jaimes-Molina's argument essentially comes down to an assertion of an alleged delay measured in seconds, if any at all. The reasonableness of the seizure's duration depends on what the officer actually does during the stop. *Rodriguez*, 135 S. Ct. at 1616. As set forth above, Sergeant McCormick's actions did not measurably extend the duration of the stop and did not unreasonably prolong the stop; he acted diligently and reasonably. *See Rodriguez*, 135 S. Ct. at 1615 (recognizing

that an officer may nevertheless conduct the unrelated task during an otherwise lawful stop but only "so long as [unrelated] inquiries do not measurably extend the duration of the stop" (quoting *Arizona*, 555 U.S. at 330)); *see also Stewart*, 902 F.3d at 674-75, 675 n. 8 (recognizing that the parsing of a timeline may be relevant to the analysis under *Rodriguez* but finding that the defendant forfeited the argument, and then finding under the plain error standard that the district court did not err in finding that the dog sniff did not lengthen the sixteen-minute traffic stop when the officers were actively engaged in the traffic stop and the mission of the stop continued while the dog sniff occurred). Based on the facts in this case, there was no Fourth Amendment violation, and the Court recommends that the Motion to Suppress be denied on this basis.

II

Moreover, even though the dog sniff did not prolong the stop, Sergeant McCormick had a reasonable suspicion of drug activity to justify prolonging the stop to enlarge the scope of the routine traffic stop and deploy his K-9 partner. *See Rodriguez*, 135 S. Ct. at 1615; *Walton*, 827 F.3d at 687 (finding that the officer had reasonable suspicion to enlarge the scope of the stop to include a canine sniff). Viewed by the "totality of the circumstances," reasonable suspicion requires "specific and articulable facts, which taken together with rational inferences from those facts, reasonably warrant th[e] intrusion." *United States v. Rodriguez-Escalera*, 884 F.3d 661, 668 (7th Cir. 2018) (quoting *Terry v. Ohio*, 392 U.S. 1, 29 (1968) ("specific and articulable facts"); *United States v. Cortez*, 449 U.S. 411, 417 (1981) ("totality of the circumstances")); *see also Walton*, 827 F.3d at 687, 688. Although reasonable suspicion requires less than probable cause, the officer must have more than a hunch of criminal activity. *Rodriguez-Escalera*, 884 F.3d at 668. Officers may rely on their "'own experience and specialized training to make inferences from and deductions about the cumulative

19

information available to them that might well elude an untrained person.'" *Rodriguez-Escalera*, 884 F.3d at 670 (quoting *Arvizu*, 534 U.S. at 273-74); *see also Walton*, 827 F.3d at 687 (quoting *United States v. Hill*, 818 F.3d 289, 294 (7th Cir. 2016)). Nervousness is one factor that can support reasonable suspicion. *Rodriguez-Escalera*, 884 F.3d at 669 (citing *Illinois v. Wardlow*, 528 U.S. 119, 124 (2000)).

In this instance, Sergeant McCormick identified several specific and articulable facts to support his reasonable suspicion. First, Jaimes-Molina's driver's license had a red "temporary" notation, which Sergeant McCormick recognized from his personal experience in Florida as an indication that Jaimes-Molina was violating federal law by being illegally in the United States. Second, Sergeant McCormick noted articulable signs that Jaimes-Molina could be a drug courier. In his experience in DeKalb County, near the border with the State of Michigan, Sergeant McCormick recognized that Jaimes-Molina was coming from a known source state for drugs. Jaimes-Molina was traveling a long distance in some else's car, and Jaimes-Molina only gave a vague explanation that the car was owned by a "relative." Jaimes-Molina had clothes and trash haphazardly scattered about his car, indicating that he was living out of the car on the long trip rather than staying somewhere. Third, based on his extensive experience with traffic stops (over 5,000), Sergeant McCormick observed Jaimes-Molina to be abnormally nervous and noted that Jaimes-Molina provided cryptic responses to questions. Based on his experience, all of these facts together constitute reasonable suspicion that Jaimes-Molina was a drug courier.

In his proposed "Findings of Fact," Jaimes-Molina contends that, although Sergeant McCormick testified that he was suspicious because of the presence of clothes in Jaimes-Molina's car and his temporary driver's license, "neither of these circumstances are evidence of a crime or

able to sustain a finding of reasonable suspicion or probable cause." (ECF 38, p. 2). First, Jaimes-Molina cites no law that these two facts cannot form part of the totality of the circumstances to create reasonable suspicion. Second, Jaimes-Molina identifies only two of the several facts relied on by Sergeant McCormick to form reasonable suspicion and offers no law or analysis why all of the identified facts taken together do not form reasonable suspicion. The facts taken together constitute more than a "hunch of criminal activity." Viewed by the totality of the circumstances, Sergeant McCormick had reasonable suspicion to justify prolonging the stop to enlarge the scope of the routine traffic stop to include a dog sniff.

## CONCLUSION

Based on the foregoing, the Court **RECOMMENDS** that the District Court **DENY** Defendant's Motion to Suppress Physical Evidence and Incorporated Memorandum in Support Thereof [DE 28].

This Report and Recommendation is submitted pursuant to 28 U.S.C. § 636(b)(1)(C). Pursuant to 28 U.S.C. § 636(b)(1), the parties shall have fourteen (14) days after being served with a copy of this Recommendation to file written objections thereto with the Clerk of Court. The failure to file a timely objection will result in waiver of the right to challenge this Recommendation before either the District Court or the Court of Appeals. *Willis v. Caterpillar, Inc.*, 199 F.3d 902, 904 (7th Cir. 1999); *Hunger v. Leininger*, 15 F.3d 664, 668 (7th Cir. 1994); *The Provident Bank v. Manor*

*Steel Corp.*, 882 F.2d 258, 260-261 (7th Cir. 1989); *Lebovitz v. Miller*, 856 F.2d 902, 905 n.2 (7th

Cir. 1988).

So ORDERED this 12th day of October, 2018.

                 s/ Paul R. Cherry                   
                 MAGISTRATE JUDGE PAUL R. CHERRY
                 UNITED STATES DISTRICT COURT