# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF INDIANA
# FORT WAYNE DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | CASE NO.: 1:17-CR-69-TLS |
| | ) | |
| IVAN JAIMES-MOLINA | ) | |

## OPINION AND ORDER

On November 29, 2017, an officer from the DeKalb County Sheriff's Department initiated a traffic stop of Defendant Ivan Jaimes-Molina's vehicle after observing the vehicle speeding. During the traffic stop, with the assistance of a drug detecting K-9, the officer uncovered drugs and a firearm. On December 19, 2017, a grand jury indicted the Defendant for knowingly and intentionally possessing with the intent to distribute 50 grams or more of methamphetamine in violation of 21 U.S.C. § 841(a)(1) (Count 1), and being an illegal alien unlawfully possessing a firearm in violation of 18 U.S.C. 922(g)(5) (Count 2).

On April 5, 2018, the Defendant filed a Motion to Suppress [ECF No. 28] evidence obtained as a result of and in conjunction with the stop on November 29, 2017. Upon referral from this Court, Magistrate Judge Paul R. Cherry held an evidentiary hearing on May 30, 2018, received post-hearing briefing, and issued a Report and Recommendation ("R&R") [ECF No. 42], recommending that the Court deny the Defendant's Motion to Suppress.

This matter is now before the Court on the Defendant's Objections to the R&R [ECF No. 44]. On October 31, 2018, the Government filed a Notice [ECF No. 45] advising the Court that the Government intends to rely both on its September 21, 2018 Response Brief [ECF No. 41] to

the Defendant's Motion to Suppress and the Magistrate Judges's R&R in response to the Defendant's Objections. The Defendant did not file a reply brief.

## STANDARD OF REVIEW

Under 28 U.S.C. § 636(b)(1)(A)–(B), a magistrate judge does not have authority to issue a final order on a motion to suppress evidence in a criminal case. Instead, the magistrate judge submits proposed findings of fact and recommendations to the district court. If a party files a timely objection to the magistrate judge's report and recommendation, § 636(b)(1) provides that

> the district judge is to make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made. The court may accept, reject, modify, in whole or in part, the findings or recommendations made by the magistrate judge. The judge also may receive further evidence or recommit the matter to the magistrate judge with instructions.

De novo review does not require a de novo evidentiary hearing, even when witness credibility is at issue. *See United States v. Raddatz*, 447 U.S. 667, 673–76 (1980). Neither party has requested such a hearing, and the Court finds that the record before the Magistrate Judge Cherry is sufficient to allow this Court to make a de novo determination.

## BACKGROUND

The Defendant's objections do not dispute the Magistrate Judge's assessment regarding the credibility of the witnesses' testimonies or the Magistrate Judge's characterization of their testimonies. Instead, the Defendant challenges the Magistrate Judge's findings that the evidence offered at the hearing supports the conclusion that law enforcement did not violate the Defendant's Fourth Amendment rights. Accordingly, as they are not disputed by either party, this

Court adopts the Magistrate Judge's findings of fact regarding the events leading up to and including the eight-minute traffic stop and dog sniff on November 29, 2017.

The Magistrate Judge's recommendation to deny the Defendant's Motion to Suppress relies on two independent findings. First, the Magistrate Judge found that Sergeant Todd McCormick did not unreasonably prolong the traffic stop when he conducted a dog sniff. Second, that Sergeant McCormick had reasonable suspicion of criminal activity to justify prolonging the stop to enlarge its scope and deploy his K-9 partner. The Defendant objects to both findings.

## ANALYSIS

### A. The Dog Sniff Did Not Unconstitutionally Prolong Traffic Stop

The Defendant argues that Sergeant McCormick electing to conduct a dog sniff during a traffic stop without reasonable suspicion of criminal activity violated the Defendant's Fourth Amendment rights against unreasonable searches and seizures.

The Fourth Amendment's prohibition from unreasonable searches and seizures "extend[s] to brief investigatory stops of persons or vehicles that fall short of traditional arrest." *United States v. Arvizu*, 534 U.S. 266, 273 (2002) (internal citations omitted). A routine stop of a vehicle for a traffic violation is more analogous to a "*Terry* stop" than to a formal arrest. *Rodriguez v. United States*, 135 S. Ct. 1609, 1614 (2015) (citing *Knowles v. Iowa*, 525 U.S. 113, 117 (1998)).

Consequently, "[l]ike a *Terry* stop, the tolerable duration of police inquiries in the traffic-stop context is determined by the seizure's *'mission'*—to address the traffic violation that warranted the stop and attend to related safety concerns." *Rodriguez*, 135 S. Ct. at 1614

(emphasis added) (quoting *Illinois v. Caballes*, 543 U.S. 405, 407 (2005)). An officer's mission in connection with a traffic violation includes determining whether to issue a traffic citation and conducting "ordinary inquires incident to [the traffic] stop." *See Rodriguez*, 135 S. Ct. at 1615 (quoting *Caballes*, 543 U.S. at 408). "Typically such inquires involve checking the driver's license, determining whether there are outstanding warrants against the driver, and inspecting the automobile's registration and proof of insurance." *Rodriguez*, 135 S. Ct. 1615 (citing *Delaware v. Prouse*, 440 U.S., 648, 658–660 (1979)).

With respect to whether a dog sniff falls within an ordinary inquiry incident to a traffic stop, the Supreme Court has held that "the use of a well-trained narcotics-detection dog—one that 'does not expose noncontraband items that otherwise would remain hidden from public view,' . . . generally does not implicate legitimate privacy interests." *Caballes*, 543 U.S. at 409 (quoting *United States v. Place*, 462 U.S. 696, 707 (1983)). Nevertheless, the Court recognized that a dog sniff "is a measure aimed at detect[ing] evidence of ordinary criminal wrongdoing" and thus, "[l]ack[s] the same close connection to roadway safety as the ordinary inquiries . . . ." *Rodriquez*, 135 S. Ct. at 1615 (quoting *Indianapolis v. Edmond*, 531 U.S. 32, 40–41 (2000)(other internal citations omitted)).

In *Rodriguez*, the Supreme Court confronted the issue of whether law enforcement may extend an otherwise completed traffic stop, absent reasonable suspicion, to conduct a dog sniff. *Rodriguez*, 135 S. Ct. at 1614. Reaffirming earlier decisions, the Court stated that a traffic stop becomes unconstitutional once law enforcement prolongs the stop beyond what is reasonably required to perform the ordinary tasks and inquiries associated with the traffic stop. *Id.* ("Authority for the seizure thus ends when tasks tied to the traffic infraction are—or reasonably

should have been—completed."). Accordingly, the Court stated that a dog sniff incident to a routine traffic stop is unconstitutional when the "sniff prolongs—*i.e.*, adds time to—the stop." *Rodriguez*, 135 S. Ct. at 1616 (internal quotations omitted).

The Defendant argues that his Fourth Amendment rights were violated because Sergeant McCormick intentionally delayed certain ordinary tasks and inquires associated with a routine traffic stop for speeding so he could conduct a dog sniff without reasonable suspicion. A chronology of the approximately eight-minute traffic stop will be informative in analyzing whether Sergeant McCormick unreasonably delayed ordinary inquiries and tasks to conduct a dog sniff.

- 01:41:17 a.m. – The Defendant's vehicle passes Sergeant McCormick's position traveling 78 miles per hour in a 70 miles per hour speed zone.
- 01:42:05 a.m. – Sergeant McCormick engages his police lights to pull over the Defendant's vehicle.
- 01:42:15 a.m. – The Defendant starts to pull over his vehicle.
- 01:42:28 a.m. – Sergeant McCormick initiates a transmission to dispatch and provides his location and the Defendant's license plate number.
- 01:42:31 a.m. – The Defendant's vehicle comes to a stop.
- 01:43:08 a.m. – Sergeant McCormick reaches the passenger side of the Defendant's vehicle.
- 01:43:57 a.m. – Sergeant McCormick begins to walk to his patrol car with the Defendant's license and registration.

- 01:44:12 a.m. – Sergeant McCormick enters his patrol car and subsequently begins to write a warning to the Defendant for the speeding violation.
- 01:46:27 a.m. – Sergeant McCormick answers a radio safety check.
- 01:47:38 a.m. – Sergeant McCormick is outside the patrol car with his K-9 partner on a leash, and then kneels next to the K-9. Sergeant McCormick finishes writing the warning before exiting the patrol car.
- 01:47:53 a.m. – Sergeant McCormick initiates a transmission to dispatch for the Defendant's driver's license check while outside his patrol car with his K-9 partner.
- 01:48:12 a.m. – Sergeant McCormick initiates the dog sniff of the Defendant's vehicle.
- 01:48:13 a.m. – Sergeant McCormick's transmission to dispatch requesting the driver's license check ends.
- 01:48:23 a.m. – The K-9 sits at the driver's door,[1] then gets up and continues to actively sniff the vehicle.
- 01:48:31 a.m. – The K-9 sits a second time at the driver's door.
- 01:50:06 a.m. – Dispatch offers Sergeant McCormick a "full read back" of the Defendant's completed driver's license check.
- 01:50:06 a.m. – Sergeant McCormick requests a "driver status" in lieu of full read back.

---

[1] Sergeant McCormick testified that his K-9 partner is trained to sit when he detects a narcotics odor. (May 30, 2018, Evidentiary Hr'g, Tr. 31–32, 54–55, ECF No. 36.)

6

- 01:50:15 a.m. – Dispatch finishes providing the driver status to Sergeant McCormick. Dispatch informs Sergeant McCormick that Defendant's license was valid and that the Defendant did not have any outstanding warrants.
- 01:50:27 a.m. – Sergeant McCormick acknowledges receiving driver's license information from dispatch.

(*See* May 30, 2018, Evidentiary Hr'g, Gov. Exs. 1, 4, 5; Tr. 34–37, 41–44.)

The Defendant makes conclusory statements that the Magistrate Judge erred in finding that Sergeant McCormick did not intentionally delay the traffic stop to conduct a dog sniff in violation of the Fourth Amendment but fails to specify how the dog sniff prolonged the traffic stop in his Objections. Instead, the Defendant's Motion to Suppress contains the support for the Defendant's argument that Sergeant McCormick intentionally delayed completing ordinary tasks and inquiries incident to the traffic stop. (*See* Mot. to Suppress, ¶¶ 5, 9, 16.) Considering the Defendant's arguments from his Motion to Suppress, the Defendant appears to object to the Magistrate Judge's finding that Sergeant McCormick unreasonably prolonged the traffic stop because he did not radio dispatch immediately upon returning to his patrol car with the Defendant's license and registration (and before Sergeant McCormick started writing the warning). In other words, the Defendant argues that Sergeant McCormick waited to call dispatch for the driver's license check until after he was finished writing the warning because it provided Sergeant McCormick with a window to conduct the dog sniff before dispatch could provide an answer to the driver's license check. (*Id.*) The Defendant appears to contend that Sergeant McCormick would not have had this window if he had radioed dispatch before writing the warning. (*Id.*)

The Defendant, however, fails to confront several facts supporting the Magistrate Judge's finding that Sergeant McCormick did not prolong any aspect of a task or inquiry associated with a routine traffic stop, including radioing dispatch for the driver's license check.

Sergeant McCormick provided testimony explaining why he did not radio dispatch to commence the Defendant's driver's license check as soon as he returned to the patrol car and, thus, before he wrote the warning. Sergeant McCormick stated that there was radio traffic between dispatch and other officers requesting and receiving information. (Tr. 24.) The in-cabin recording in Sergeant McCormick's patrol car confirms there was radio traffic between dispatch and other officers. (Gov. Ex. 4.) Thus, as Sergeant McCormick testified, he had to wait for an opening in the radio communication to make his request as there was only one radio channel and one dispatcher for the officers that work for the DeKalb County Sheriff's Department as well as the cities of Butler and Waterloo. (Tr. 21.) According to Sergeant McCormick, if he had requested that dispatch check the Defendant's driver's license while Sergeant McCormick was in the car writing the warning, dispatch would not have been able to attend to his request—hence, not expediting the eight-minute traffic stop. (Tr. 24.)

The Defendant attempts to undermine Sergeant McCormick's testimony, claiming that Sergeant McCormick's explanation that the radio traffic was the reason he waited to radio dispatch for the driver's license check is contradicted by evidence that there was no radio traffic for eighty-eight percent of the time Sergeant McCormick was writing the warning in the patrol car. (*See* Br. in Supp. of Def.'s Mot. to Suppress p. 3, ECF. No. 37.) This apparent contradiction is reconciled by Sergeant McCormick's testimony that he needed to wait for dispatch to answer officers who had made earlier requests to dispatch before he could make his request as there was

8

only one dispatcher. (*See* Tr. 21, 56–57.) According to Sergeant McCormick, radioing in his request for a driver's license check during the silent period before dispatch answered other officers' requests would not have quickened the traffic stop. (*See* Tr. 57, 79.)

The Defendant cites to the chronology, arguing that it demonstrates Sergeant McCormick needed two and a half minutes to write the warning, [2] and dispatch needed approximately two minutes to run the driver's license check. [3] Thus, supposedly, because the time for dispatch to resolve the driver's license check was shorter than the time for Sergeant McCormick to write the warning, the Defendant maintains that even if dispatch was busy answering the calls from other officers, Sergeant McCormick should have radioed in the driver's license check. In this way, dispatch would have had time to deal with the other officer's requests and then turn to Sergeant McCormick's license check request. (*See* Mot. to Suppress, ¶¶ 5, 9.)

The Defendant's suggestion ignores Sergeant McCormick's uncontested testimony that there was radio traffic between dispatch and officers when he entered his patrol car to write the warning. (Tr. 21, 24.) Invariably, even if Sergeant McCormick had radioed dispatch immediately upon reentering the patrol car, dispatch would have needed more than two minutes to complete Sergeant McCormick's driver's license check because dispatch would simultaneously be attending to earlier officer requests (*Id.*) Indeed, consistent with Sergeant McCormick's

---

[2] The patrol car's in-cabin view video recording, which records time lapsed in minutes and seconds as opposed to time of day, shows Sergeant McCormick began writing the warning at four minutes and thirty-two seconds. The in-cabin recording shows that at six minutes and fifty-four seconds, Sergeant McCormick exited the patrol car with the completed written warning. (Gov. Ex. 4; Tr. 34–37.)

[3] Audio recordings between Sergeant McCormick and dispatch show that Sergeant McCormick ended his transmission to dispatch requesting a driver's license check at 01:48:13 a.m. At 01:50:11 a.m., dispatch finished their transmission to Sergeant McCormick informing him that they were ready to provide a "full read back" for the driver's license check. (Gov. Ex. 5; Tr. 41–42, 43–44.)

testimony, the reason why dispatch was able to answer Sergeant McCormick's request for the Defendant's driver's license within two minutes of receiving the request was because Sergeant McCormick waited until dispatch had resolved earlier officers' requests. Therefore, the Defendant's contention that Sergeant McCormick could have completed the driver's license check before he finished writing the warning is unpersuasive.

Furthermore, even if dispatch could have relayed the driver's license information to Sergeant McCormick within two minutes despite the presence of radio traffic, Sergeant McCormick still would likely not have reduced the duration of the traffic stop had he requested the driver's license check before he began to write the warning. The Defendant fails to account for the time it took Sergeant McCormick to communicate his request for a driver's license check and the time it took dispatch to communicate their answer to Sergeant McCormick. The Defendant calculated that one minute and fifty-seven seconds elapsed from the time Sergeant McCormick finished radioing the request and the time dispatch began relaying that information to Sergeant McCormick. (Mot. to Suppress, ¶¶ 5, 9.)  Importantly, the Defendant does not account for the twenty seconds it took Sergeant McCormick to call in the driver's license to dispatch and dispatch's eighteen second call to Sergeant McCormick with the license information. (Gov. Ex. 5; Tr. 41–44.) Therefore, if Sergeant McCormick had requested the driver's license information when he entered his patrol car and started writing the warning, the total time inside the patrol car would have been extended by thirty-eight seconds—subsuming any time supposedly saved if Sergeant McCormick had requested the driver's license check before writing the warning.

Other than the argument Sergeant McCormick could have multitasked by writing the warning and initiating the driver's license check, the Defendant presents no other argument supporting his proposition that Sergeant McCormick unreasonably prolonged the stop to allow for the dog sniff. In fact, the chronology reveals that Sergeant McCormick was on-task for the entirety of the traffic stop, going through the various inquiries and tasks ordinarily associated with a routine traffic stop. The Court finds no point during the traffic stop where Sergeant McCormick could be characterized as dawdling.

Sergeant McCormick's deliberateness during the traffic stop is attributable to following the best practices for conducting traffic stops, reinforced by his extensive patrol experience garnered through performing over 5,000 stops. (Tr. 20.) United States Drug Enforcement Officer Peter Mooney, an expert witness, testified that law enforcement must stay focused and not rush during a traffic stop to avoid clerical mistakes and ensure officer safety. (Tr. 79–80.) Officer Mooney testified: "You do one thing at a time. You finish one thing and then to the next thing and so forth, and so forth until the traffic stop is completed." (Tr. 79.) Therefore, in addition to performing one task at a time—such as radioing dispatch only until after he had written the warning—Sergeant McCormick also took precautions to ensure his safety during the traffic stop which invariably added some time. For example, Sergeant McCormick periodically looked up from his patrol car while writing the warning to check on the Defendant to confirm the Defendant was not preparing to escape or reach for a weapon. (Tr. 37, 66.) Sergeant McCormick also walked around behind his patrol car to approach the passenger side of the Defendant's vehicle, instead of walking directly from the patrol car's driver's door to the Defendant's car's driver's door, because the stop occurred at night on a highway with a relatively high-level of

11

truck traffic. (Tr. 37, 44.) Hence, consistent with the Supreme Court and Seventh Circuit case law, Sergeant McCormick did not unconstitutionally prolong the stop by electing to perform one task at a time, such as writing the warning before radioing dispatch, to ensure an orderly and safe traffic stop. *See e.g.*, *United States v. Stewart*, 902 F.3d 664, 672 (7th Cir. 2018) ("Because traffic stops are 'especially fraught with danger to police officers,' an officer may . . . take 'certain negligibly burdensome precautions in order to complete his mission safely.'" (quoting *Rodriguez*, 135 S. Ct. at 1616)).

The Defendant contends, in conclusory fashion, that the Magistrate Judge's findings with respect to the dog sniff incident to a traffic stop contravenes the Supreme Court's decision in *Rodriguez*. Although the Defendant is right that *Rodriguez* provides the correct framework to evaluate whether a dog sniff incident to a traffic stop is constitutional, *Rodriguez* does not prohibit the dog sniff in this instant case. In *Rodriguez*, the officer in question stopped the defendant's vehicle for a traffic violation and completed writing the warning and other ordinary traffic stop tasks in twenty-two minutes. *See* 135 S. Ct. at 1613. After completing the traffic stop's mission, the officer asked the defendant to consent to a dog sniff. *Id.* The defendant refused. *Id.* Nevertheless, eight minutes later, the officer and a backup officer initiated a dog sniff, which uncovered drugs. *Id.* The Court found that the traffic stop was delayed by eight minutes due to the dog sniff, and not delayed due to any task or inquiry ordinarily associated with a stop for a traffic violation or to ensure safety—thereby violating the defendant's Fourth Amendment rights. *Id.*, at 1616–17.

No such delay is present in this case. At the outset, even if Sergeant McCormick had conducted the traffic stop as the Defendant proposes—radioing dispatch before starting to write

12

the warning—there is no evidence, as explained above, to support that the Defendant's contention that his alternative approach would have expedited the traffic stop. Furthermore, Sergeant McCormick is not required to perform a traffic stop in a manner the Defendant deems most time efficient; Sergeant McCormick is required to conduct a traffic stop that does not cause an unreasonable delay beyond what is required to complete the mission of the stop. *See United States v. Sharpe*, 470 U.S. 675, 687 (1985) ("The question is not simply whether some other alternative was available, but whether the police acted *unreasonably* in failing to recognize or to pursue it." (emphasis added)). The Defendant presents no argument that Sergeant McCormick electing to conduct a dog sniff *while* waiting for dispatch's driver's license check, after writing the warning, led to an unreasonable delay akin to the delay in *Rodriguez*, where the officers elected to complete a dog sniff eight minutes *after* the completion of a twenty-two minute traffic stop mission. Therefore, contrary to the Defendant's summary assertions, the Magistrate Judge was correct in finding that the dog sniff did not unconstitutionally delay the traffic stop.

**B.     Sergeant McCormick Had Reasonable Suspicion of Drug Activity to Prolong Traffic Stop and Conduct Dog Sniff**

The Magistrate Judge found that the dog sniff did not violate the Defendant's Fourth Amendment rights for the independent reason that Sergeant McCormick had reasonable suspicion of criminal activity to prolong the stop and enlarge its scope. The Defendant contends that the alleged suspicious circumstances the Magistrate Judge cites fails to give rise to the requisite reasonable suspicion of criminal activity to justify a dog sniff.

The Supreme Court has stated that officers "may conduct certain unrelated checks during an otherwise lawful traffic stop." *Rodriguez*, 135 S. Ct. at 1615. "But . . . [an officer] may not do

13

so in a way that prolongs the stop, absent the reasonable suspicion ordinarily demanded to justify detaining an individual." *Id.* Information that is obtained during the mission of the stop pursuant to a traffic violation "may provide the officer with reasonable suspicion of criminal conduct that will justify prolonging the stop to permit a reasonable investigation." *United States v. Figueroa-Espana*, 511 F.3d 696, 702 (7th Cir. 2007) (internal citations omitted). Hence, an officer may conduct a dog sniff to investigate criminal activity during a routine traffic stop, even if it extends the duration of the stop, provided that the officer obtained information during the stop giving rise to reasonable suspicion of criminal activity. *See United States v. Walton*, 827 F.3d 682, 687 (7th Cir. 2016) (finding that the officer obtained information giving rise to the requisite reasonable suspicion during a traffic stop to prolong the stop beyond its mission to conduct a dog sniff).

A court is to analyze "the totality of the circumstances—the whole picture" to determine whether law enforcement formed the requisite reasonable suspicion needed to prolong a traffic stop. *United States v. Cortez*, 449 U.S. 411, 417 (1981). Although the "totality-of-the-circumstances test does not bar courts from discussing factors separately," a "divide-and-conquer analysis that examines each factor supporting reasonable suspicion in isolation is not permitted." *United States v. Rodriguez-Escalara*, 884 F.3d 661, 668 (7th Cir. 2018) (internal quotations omitted) (quoting *Dist. of Columbia v. Wesby*, 138 S. Ct. 577, 588 (2018)).

The Magistrate Judge found that, to the extent the dog sniff delayed the traffic stop, Sergeant McCormick had reasonable suspicion to do so. The Magistrate Judge identified specific and articulable facts giving rise to Sergeant McCormick's reasonable suspicion of criminal activity.

1. Sergeant McCormick observed that the Defendant's Florida driver's license had a "red temporary notation," which led Sergeant McCormick to suspect that the Defendant was illegally in the United States.
2. Sergeant McCormick suspected the Defendant was a drug courier as i) the Defendant was stopped near the border with the State of Michigan, a known "source state" for drugs; ii) the Defendant was traveling a long distance in someone else's car, which the Defendant vaguely explained belonged to a relative; and iii) the Defendant had clothes and trash haphazardly scattered about his car, suggesting that he was living out of his car for a long-distance trip.
3. Based on his over 5,000 traffic stops, Sergeant McCormick perceived the Defendant to be abnormally nervous and noted that the Defendant only provided vague and cryptic responses to his questions.

(R&R, at 20.)

The Defendant objects on two grounds. First, that Defendant argues that Sergeant McCormick's observation that the Defendant had "clothes strewn about the cabin of the vehicle" did not give rise to the requisite reasonable suspicion to prolong the stop and conduct a dog sniff. (Def.'s Objections, at pp. 3–4.) Second, the Defendant contends Sergeant McCormick's alleged suspicion that the Defendant's temporary Florida driver's license raised the possibility that the Defendant was an illegal immigrant was impermissible to give rise to the requisite reasonable suspicion that the Defendant was an illegal immigrant because such a notification does not necessarily mean that its holder is an illegal immigrant. (*Id.*)

Although the Defendant may be correct that the above-listed suspicious circumstances individually do not give rise to reasonable suspicion, this Court agrees with the Magistrate Judge's finding that, after examining the totality of the circumstances, Sergeant McCormick had reasonable suspicion of criminal activity to justify a dog sniff. The Sixth Circuit case of *United States v. Orsolini*, 300 F.3d 724 (6th Cir. 2002), provides an illustrative example of how suspicious circumstances similar to those present in this case may not individually give rise to reasonable suspicion alone but nevertheless give rise to reasonable suspicion when viewed together.

In *Orsolini*, an officer pulled over the defendant and a passenger for speeding and called for assistance. 300 F.3d at 726–27. After the second officer arrived, the officers together began to question the defendant and the passenger. *Id.* The first officer issued the defendant a citation for speeding and told the defendant he was free to leave. *Id.* As the defendant was preparing to leave, the second officer began inquiring whether there was any contraband in the defendant's vehicle and asked if he would consent to a search. *Id.* The defendant consented but withdrew his consent once the officers directed him and the passenger to stand on the road. *Id.* The officers ultimately conducted a dog sniff and uncovered contraband. *Id.* The district court found that the officers did not have the requisite reasonable suspicion to prolong the stop after the defendant received his citation for speeding. *Id.*

The Sixth Circuit reversed because it found the district court erred by considering the factors giving rise to reasonable suspicion in isolation and failed to weigh certain significant facts the officers observed during the stop. *Id.*, at 728–29. According to the circuit court, the district court failed to take into account that the officers observed that: 1) the defendant's only

proof of identification was a photocopy of a temporary, out-of-state driver's license; 2) luggage was in the back seat of the defendant's vehicle as opposed to the trunk; and 3) there were piles of clothes and food wrappers strewn around the vehicle's interior suggesting the defendant and passenger were travelling a long distance without stopping. *Id.* The Sixth Circuit concluded that although none of the three above-listed factors individually create reasonable suspicion of criminal activity, when they are examined together with additional factors the district court did consider—such as the defendant's nervousness and purchase of the vehicle from a "source city for drugs"—they collectively give rise to reasonable suspicion of drug trafficking to delay the stop and conduct a dog sniff. *See id.*

Similarly, in this case, though Sergeant McCormick's observations may not individually give rise to reasonable suspicion, collectively, they do. Consistent with *Orsolini*, the Defendant's temporary and out-of-state driver's license, the Defendant's clothes and trash strewn around the vehicle's interior, the Defendant's nervousness and vague answers to Sergeant McCormick's questions,[4] and the fact that the Defendant was traveling a long-distance and south-bound from Michigan, a "source state" for drug trafficking, at 1:40 a.m., together gives rise to the requisite reasonable suspicion that the Defendant was engaged in drug trafficking activity. Hence, this Court finds that the Magistrate Judge did not err in finding that Sergeant McCormick had reasonable suspicion of criminal activity to prolong the traffic stop and conduct a dog sniff.

---

[4] The Seventh Circuit stated that "nervousness *alone* is insufficient to support a finding of probable cause or reasonable suspicion." *See e.g.*, *United States v. Leiva*, 821 F.3d 808, 818 (7th Cir. 2016) (emphasis added); *Huff v. Reichert*, 744 F.3d 999, 1007 n.3 (7th Cir. 2014) ("[O]ur circuit . . . has held that nervousness is of limited value in assessing reasonable suspicion . . . ." (internal quotations omitted)). Accordingly, this Court affords minimal value in its reasonable suspicion analysis to Sergeant McCormick's observation that the Defendant was nervous during the traffic stop.

## CONCLUSION

For the reasons stated above, the Court ADOPTS the Report and Recommendation [ECF No. 42] and DENIES the Motion to Suppress [ECF No. 28]. A separate scheduling order will be issued.

SO ORDERED on December 4, 2018.

                                        s/ Theresa L. Springmann
                                        CHIEF JUDGE THERESA L. SPRINGMANN
                                        UNITED STATES DISTRICT COURT